UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:11-cv-00548-MOC-DSC

| | | |
|---|---|---|
| **VALINDA STREATER**, as Guardian ad Litem for J.G., a minor, | ) ) ) | |
| Plaintiffs, | ) ) | |
| Vs. | ) ) | ORDER |
| **CITY OF CHARLOTTE, et al.**, | ) ) ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on defendant Matthew Wilson's (hereinafter "Officer Wilson") renewed Motion for Judgment as a Matter of Law. In that motion, Officer Wilson has raised qualified immunity as an affirmative defense, arguing that he is entitled to qualified immunity.

**FINDINGS AND CONCLUSIONS**

**I.    Introduction**

When considering a request for qualified immunity, the court considers the facts in the light most favorable to the party opposing granting judgment based on qualified immunity. Scott v. Harris, 550 U.S. 372, 378 (2007); Brown v. Gilmore, 278 F.3d 362, 362 & 366 (4th Cir.2002). When faced with a motion seeking judgment based on qualified immunity, a court must decide whether, as a matter of law, viewing the facts in the light most favorable to the plaintiff, the defendant should prevail based on the asserted qualified immunity. Scott, 550 U.S. at 378. When there is conflict as to what occurred, "this [factual conflict] usually means adopting ... the plaintiff's version of the facts." Id. As demonstrated at the first trial of this matter, there are genuine disputed issues of material fact surrounding Officer Wilson's shooting of a then 15 year

1

old minor plaintiff J.G. (hereinafter "the minor plaintiff"). Thus, the court will adopt the plaintiff's version of the facts as presented at trial.

## II. Analysis of a Claim of Qualified Immunity

In determining whether a police officer is entitled to the protections of qualified immunity, a court considers two issues: (1) whether a constitutional or statutory right would have been violated on the facts alleged by the plaintiff; and (2) whether the right asserted was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 200 (2001). If either inquiry is resolved in favor of the officer, qualified immunity applies. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In excessive force cases, the analysis begins with Graham v. Connor, 490 U.S. 386 (1989), in which the Supreme Court held that the analysis of the reasonableness of a particular use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396 (emphasis added). Whether a suspect posed an immediate threat of harm to the officer seeking immunity is a factor relevant to the analysis of an excessive force claim under the Fourth Amendment. Waterman v. Batton, 393 F.3d 471, 477 (4th Cir.2005) (holding that officers were not entitled to judgment as a matter of law on merits of underlying excessive force claim because "a reasonable jury could conclude ... that a perception by the officers that [plaintiff] posed a threat of serious physical harm to them would have been unreasonable," but then awarding qualified immunity because the unconstitutionality of the officers' conduct was not clearly established); Jones v. Buchanan, 325 F.3d 520, 529 (4th Cir.2003) (concluding that an excessive force claim survived summary judgment because, under

the factors set forth in Graham, "[a]fact finder could conclude that [the] evidence demonstrates that [the suspect] posed no immediate threat to anyone before [law enforcement] entered the processing room and used force"); Gray–Hopkins v. Prince George's County, Md., 309 F.3d 224, 231 (4th Cir.2002) (affirming denial of qualified immunity where, "[b]ased on the plaintiff's version of the events giving rise to this case, ... he was not posing a threat to the safety of the officers or others.... [A] trier of fact could clearly conclude that a Fourth Amendment violation occurred"). Here, the reasonableness of the actions of the officer on that night are viewed from the perspective of an officer on the street, not from the perspective of the plaintiff or the defendant officer, under a totality of the circumstance test.

## III. Factual Background

### A. Introduction

Fortunately, due to Officer Wilson not raising qualified immunity until after the first trial, the court comes at this motion from a rather unique vantage point, that is, after all the evidence has been fully presented to a jury, which could not reach a verdict, and before the second trial. In reviewing the totality of the testimony, exhibits, and circumstances presented, the court must consider whether Officer Wilson's decision to use deadly force was reasonable when viewed from the perspective of a reasonable person in the position of the officer at the time the alleged violation occurred. Mitchell v. Forsyth, 472 U.S. 511, 535 (1985).

While plaintiffs have focused in their response on events that led up to the shooting, including the reasons that motivated him to be on the street with a knife in hand, that is not the perspective from which a qualified immunity analysis is conducted. Instead, the court will focus on the circumstances that were presented to Officer Wilson on October 16, 2010, when the shooting occurred. To that end, that court has closely reviewed the testimony and exhibits

3

presented at trial as reflected in the transcripts of those proceedings. See Transcript (hereinafter "Tr.") ((#82) through (#85)).

**B. Valinda Streater**

Plaintiffs called Ms. Streater, who testified that at the time of the incident, her son (the minor plaintiff) was 15 years old. Id. at 143. On October 16, 2010, she had told her boyfriend, Mr. Bruce Jenkins (hereinafter "Mr. Jenkins"), that she did not want him in her house anymore. Id. at 147. After taking her parents to dinner that night, she returned with her parents to her home at about 8:30 p.m. Id. After her parents went to bed, she heard a rapid knock on the door, then Mr. Jenkins kicked the door in, and stabbed or cut her on her side with a knife. She then ran out of the house and up the street. Id.

She described Mr. Jenkins as being about 240 pounds and 5'7" and that he was "wider than he is tall," id. at 149, and that the minor plaintiff was about 110 pounds and 5'5" tall at the time. Id. She testified that as she ran away from the house, Mr. Jenkins pursued her, but that a person in a van aided her escape by purposely blocking Mr. Jenkins. Id. Eventually, she was able to get to a neighbor's house and asked them to call the police, id., who arrived in approximately 10 minutes. Id. at 151. She testified that she last saw her assailant, Mr. Jenkins, leave the scene in his car before the police arrived. Id. at 152.

She testified that when Officer Wilson arrived at the scene, she told him that Jenkins was her assailant, that he had stabbed her in her side, and that he had already left the scene as she saw him go up the street in his car. Id. at 153. She testified that she gave Officer Wilson a description of that car, a gold Honda Accord. Id. She could not remember whether Officer Helms was present when she gave Officer Wilson such information, id., but confirmed that Officer Wilson was there. Id. at 154.

4

Ms. Streater then testified that she told Officer Wilson she was concerned for the safety of her elderly parents because after the attack she saw Mr. Jenkins go back to her home and that she wanted to go check on them. Id. She stated that Officer Wilson told her she could not go back, to stay where she was, and that the police would go to her home to check on her parents. Id. Ms. Streater then testified that she observed Officer Wilson go down the street towards her home, holding a flashlight. Without being able to see exactly who was coming down the street toward the officer, she then heard Officer Wilson say "'put the weapon down.'" Id. at 156. She then testified that she then recognized the person as her son, the minor plaintiff. Id. She stated that she too was screaming for her son to put the weapon down, but she did not know if he could hear her. Id.

She then testified that she screamed at Officer Wilson, who she observed had his gun out, "That's Jeffery, don't shoot. That's my son . . . . That's my son, please don't shoot. Don't shoot, that's my son." Id. at 157. She indicated that she was only a few feet away from Officer Wilson when she told him that it was her son and when the shots were fired. Id. at 157-158. She testified that she learned the following day that her son had received two gunshot wounds, one in the arm and one in the abdomen. Id. at 161.

**C.   Officer Andrew Helms**

Plaintiffs called Officer Andrew Helms, the officer who arrived on the scene immediately after Officer Wilson. He testified that before the shooting occurred, Ms. Streater told *him* that her boyfriend had stabbed her, but that he had left the scene in his bronze Honda. Id. at 370. He testified that he relayed such information via his police radio before any shots were fired. Id. at 370-371. Officer Helms testified that between 30 seconds and one minute after broadcasting his

report, he heard Officer Wilson's shots. Id. at 371. As discussed below, Officer Wilson testified that he heard no broadcast.

He testified that he saw Ms. Streater advance toward Officer Wilson when she realized the person coming up the street was her son. He also testified that he heard Ms. Streater yell at Officer Wilson that the person coming up the street was her son. He testified, however, that there was a lot of simultaneous yelling from Ms. Streater, Officer Wilson, and the minor plaintiff.

### D. The Minor Plaintiff

Plaintiffs called the minor plaintiff. He testified that he learned his mother had been stabbed when his friend called him. Id. at 187. He walked up the street, saw the door knocked down, the windows of his mother's car knocked out, and then went in his house and looked around. Id. He then grabbed a knife from the kitchen and walked back up the street. Id. "By this point I was walking with the knife down by my -- by my side yelling and screaming. I was cursing." Id. at 189. He then testified as to encounter with Officer Wilson:

> And then I seen a flashlight. Somebody was pointing a flashlight at me and then they was screaming at me, "Drop the knife" -- well, at first he said, "Drop the weapon. Drop the weapon." He said that around two times, two or three times. And then after the third time, I threw the knife down. It was down by my side. I threw it down. I threw it to the left.
> And he was like, "Drop the knife. Drop the knife."
> I was like, "Didn't you just see me drop the knife?" And after that -- like 3 or 4 seconds after I said, "Didn't you see me drop the knife," he didn't say nothing. So after that, that when I -- well, that's when I got shot and then I started running.

Id. at 189.

The minor plaintiff went on to testify that while he was walking a little fast initially, he was standing still when the officer was speaking to him. Id. at 193. While Officer Wilson testified that he observed the minor plaintiff swinging the knife, id. at 91, the minor plaintiff

6

testified that he did not swing the knife at the police at any time and did not in any way threaten any police officer. Id. at 213.

### E. John Story

Plaintiffs called Mr. John Story, a professional land surveyor, who had used measurements of the crime scene to draw a diagram indicating where various items of evidence were found as well as the positions of both Officer Wilson and the minor plaintiff when the shooting occurred. Id. at 264. When he arrived at the scene, he found that paint markings used by forensic officers remained on the ground. Id. at 265.

On direct examination, Mr. Story could not recall the distances he had surveyed. After cross examination also failed to elicit such information, this court asked Mr. Story if he could recall that distance between the officer and the minor plaintiff based on the markings and his diagram:

> THE COURT: What was the distance between point 9 and point 12 as you measured, do you remember? . . . .
>
> THE WITNESS: Between the police officer and the shooting victim? I don't recall. It's on a measure of 30 something feet perhaps.

Id. at 274. While, as discussed below, Officer Wilson testified that the minor plaintiff was 20 feet away when he fired, Mr. Story testified that based on the points forensically identified by the CMPD, Officer Wilson was some 30 feet away. Also as discussed below, CMPD's own crime scene investigator testified that the distance was actually 31.9 feet.

### F. Melvin Tucker

Plaintiffs called Mr. Melvin Tucker (hereinafter "Tucker"), a litigation consultant and a police trainer. Id. at 286. Mr. Tucker testified that he was a former FBI agent, former police chief in three cities in Tennessee and North Carolina, and ended his career as the police chief in

7

Tallahassee, Florida. Id. at 290. After voir dire and additional testimony concerning his training and experience, the court found Mr. Tucker to be expert in police procedures and practices including the use of force. Id. at 301.

Mr. Tucker's testimony to a great degree concentrated on "reactionary gaps" and the training North Carolina police officers receive in Basic Law Enforcement Training (hereinafter "BLET"). Id. at 308. He testified that there are a number of reactionary gaps officers should maintain between themselves and members of the public, especially where the other person is armed. Id. at 320-321. He testified that the reactionary gap when an officer is confronted with a person armed with an edged weapon is 21 feet, id. at 323-324, and that in reviewing the measurements taken by the CMPD, Officer Wilson was 31.9 feet away from the minor plaintiff when he fired. Id. at 321. When asked whether a person standing 32 feet away with a knife is a threat, Mr. Tucker answered

> A. You're a potential threat, but no, you're not an immediate threat.
>
> Q. Am I a threat to you that would allow you to use deadly force if I'm 32 feet away from you with an edged knife that's 6 inches long . . . ?
>
> A. No, sir.
>
> Q. Under any circumstances?
>
> A. No, sir, under no circumstances because you can't – you can't harm me from there. You have a potentially deadly weapon, but you don't have the opportunity to harm me from that distance.
>
> Q. And what about 21 feet if your weapon is drawn, is this a justification ever to use deadly force with a knife, to defend against a knife attack using deadly force?
>
> A. You can use deadly force against a knife attack if you're in a position where you're in immediate jeopardy which would be like up here, but not back there.

8

Id. at 324-325. Based on his analysis of the circumstances, Mr. Tucker was of the opinion that Officer Wilson's use of force was excessive and unreasonable and that other law enforcement officers would not have used deadly force under the same or similar circumstances. Id. at 326. He was also of the opinion that such reactionary gap of 21 feet allowed the officer with weapon drawn and in a shooting position to get off 14 rounds in that time. Id. at 323. He was also of the opinion that at 32 feet, "under no circumstances because you can't – you can't harm me from there. You have a potentially deadly weapon, but you don't have the opportunity to harm me from that distance." Id. at 324.

### G. CSI Nora Beamon

Plaintiffs also called Ms. Nora Beamon, a crime scene investigator employed by the CMPD. She testified that she had talked with Officer Wilson concerning his location when he fired his weapon and where the minor plaintiff was when the shots were fired. Id. at 380. She testified that such distance was approximately 32 feet. Id. She also testified as to other evidence gathered, including bullets recovered from the bathroom floor of a nearby house and the bumper of a car. She also testified that the knife was found at a mid-point between where Wilson indicated he was standing and where the minor plaintiff was standing at the time of the shooting. Id. at 407.

### H. Officer Wilson

Officer Wilson was called by plaintiffs. Officer Wilson testified that he had been employed as a patrol officer by the Charlotte Mecklenburg Police Department for five years and before that he was in the United States Marine Corps. Tr. at 29. He testified that before becoming a police officer, he went through Basic Law Enforcement Training ("BLET"), and was trained in the proper use of lethal force and non-lethal force. Id. at 32.

9

On the night of the incident at issue here, he testified that he responded to a call for service on Brandie Glen Road, in Charlotte, North Carolina, which came in as an assault with a deadly weapon with injury. Id. at 35-36. While in route to the incident, Officer Wilson testified that he received updates from dispatch that a female victim had been stabbed and that the suspect was still on the scene. Id. at 36. Although he was told that the suspect was still on the scene, Officer Wilson testified that he received no description of the suspect from dispatch. Id. at 37. Officer Wilson was the first police officer to arrive at the scene, followed immediately by Officer Helms in another patrol car. Id. at 46-48. Having parked down the street from where the call came in, Officer Wilson encountered three people as he approached the house from where the call for assistance originated. Id. at 48. When he and Officer Andrew Helms approached the group of three, which included the stabbing victim (later identified as Ms. Valinda Streater, plaintiff herein), he noticed that the door was wide open to the residence. Id. at 49. After instructing Officer Helms to stay with Ms. Streater, Officer Wilson then walked towards the open door. He saw a young man standing in the doorway using a cell phone and asked who else was in the house and who had been hurt. Id. At that point, the young man indicated he was the only one in that house and, in response to the question concerning who had been hurt, pointed toward the group that included Ms. Streater, who was standing in the driveway. Id.

At that point, Officer Wilson turned back and approached the group, asking who had been hurt. Id. Ms. Streater raised her hand and showed Officer Wilson her side where a cut mark had been made in her shirt with visible blood. Id. at 50. According to Officer Wilson, neither Ms. Streater nor anyone else in the driveway told him who had cut her or provided him with a description of the assailant. Id. at 51. He testified that he then spoke with a man in the driveway and based on that conversation he developed a belief that the suspect was still at Ms.

10

Streater's residence up the road. Id. He instructed Officer Helms to stay with Ms. Streater and then proceeded up the road towards Ms. Streater's residence. Id. at 52. He testified that the gentleman with whom he had been speaking informed him that Ms. Streater's elderly parents were in the home, that a man had kicked in Ms. Streater's door and stabbed her, and that Ms. Streater feared that her parents would be harmed, and that she wanted an officer to go to her home and check on her parents. Id. When asked why he did not question Ms. Streater directly concerning who her attacker was before proceeding to her home, Officer Wilson responded that "[i]f something was going on, I didn't want to waste the time talking. I wanted to get there to make sure her parents were okay." Id. at 53.

After determining the exact address of the home by questioning Ms. Streater, Officer Wilson testified that he then proceeded up the street at a trot almost in the middle of the road. Id. at 57. While it was nighttime, the road was lit by streetlamps. Id. As he went up the street, he heard cursing coming from the direction in which he was walking. Id. at 58. He then saw two his right hand, approximately fifty feet away. Id. Officer Wilson testified that he kept his focus on the two individuals who were approaching him and the object being held to determine exactly what it was. Id. at 59. He testified that the pair were walking towards him at an above average rate, but not at a run. Id. After identifying the object as a knife at a distance "shortly after 50 feet," id., Officer Wilson testified that he gave repeated commands to the person holding the knife to "drop the weapon." Id. at 60. He testified that despite his commands the subject did not drop the knife and the pair continued to walk towards him. Id. at 60-61. At that point, Officer Wilson testified, as follows:

> I repeatedly told him to drop the weapon. Based off training and experience, if they do not follow the first command, you change the language so maybe they would understand that. I then advised him to drop the knife, gave him something more specific, and yelled that multiple times.

11

Id. at 61.   At that point, Officer Wilson had already unholstered his gun and had taken up a shooting "A-Frame" position aiming his weapon at the minor plaintiff.  Id.  He testified that he did not see the minor plaintiff throw down the knife and did not hear Ms. Streater state that the person with the knife was her son.  Id.  He testified that at the time Ms. Streater was with Officer Helms one-to-two house lengths back.  Id. at 62.   At that point, Officer Wilson changed the command from "drop the weapon to drop the knife" multiple times.   Id. at 63.  Officer Wilson then testified that:

> He refused to drop the knife at that point. Fearing for my life, life of Officer Helms, Ms. Streater who had already been stabbed behind me, and there was also another male, another female in the driveway to include a young man inside of a residence with the door wide open, believing he was in imminent threat of serious bodily harm or death to any party involved or there on the scene, I was forced to use lethal action.

Id. at 63.  When asked by counsel for plaintiffs what distance the minor plaintiff was when he fired, Officer Wilson testified " I estimated 20 feet."  Id.  He further testified at this distance, the minor plaintiff was within his "reactionary" or danger zone.  Id.   He went on to testify that despite having a microphone/speaker on his shoulder, he did not hear any broadcast that the suspect had already left the area in a gold Honda.

Officer Wilson testified that he initially fired two shots at the minor plaintiff and that the minor plaintiff then turned and "bladed himself," and then turned back towards the officer, still holding the knife in his right hand.  Id. at 70-71.  Officer Wilson stated that he believed that the first two rounds had missed, but that the minor plaintiff had now stopped his forward advance and that the knife, while still in his right hand, was now down by his thigh.  Id. at 72.  After reassessing the situation and determining that the minor plaintiff was still standing with the knife

in his hand, Officer Wilson testified that he then fired two more rounds. Id. At that point, Officer Wilson testified that the minor plaintiff turned to his right and ran. Id. at 76-77.

Officer Wilson went on to testify that after the incident, he learned that at least two of his four shots had gone astray, with one ending up in a second-floor bathroom of a neighboring house to his left and another round ending up in the bumper of a car parked on the street to his right. Id. at 85. The minor plaintiff was later found by Wilson and other officers hiding in bushes between houses, where he eventually surrendered without additional shots being fired. Id. at 93-94. After taking the minor plaintiff into custody, Officer Wilson asked him where the knife was and he responded that he had thrown it in the street. Id. at 95. Officer Wilson testified that the knife was found beside the street in a yard. Id. After handcuffing the minor plaintiff, Wilson flagged down a medic to assist the minor plaintiff. Id. at 97. Officer Wilson then testified that later that night he came back to the scene as part of the crime scene investigation, id. at 98, where he assisted crime scene investigators in determining where he actually stood when he fired and where he believed the minor plaintiff was located. This distance was approximately 32 feet rather than the 20 feet Officer Wilson testified he believed was between the two.

## II. Discussion

A police officer is immune from claims brought under § 1983 unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The court must "first . . . identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir.1998). Next, the court must "determine whether that right was clearly established at the time of the incident." Vathekan v. Prince George's County, 154

13

F.3d 173, 179 (4th Cir.1998). If the right was clearly established, the Court must decide whether a reasonable officer could have believed that his actions were objectively reasonable in light of the circumstances. Id.

### A. Specific Right Asserted

Plaintiff has asserted that the defendant officer's use of force violated his Fourth Amendment right to be free from excessive force in effectuating a Fourth Amendment seizure by shooting him when he, while armed with an edged weapon, was at a distance that did not pose an immediate threat to the safety of the officer or others.

### B. Right Clearly Established

Next, the court must determine whether this right was "sufficiently clear at the time . . . to make it plain to reasonable officers that their actions under these particular circumstances violated" plaintiff's constitutional rights. Winfield v. Bass, 106 F.3d 525, 531 (4th Cir.1997) (en banc). In doing so, the court asks two questions to determine whether qualified immunity applies: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," Pearson v. Callahan, 555 U.S. 223, 232 (2009); and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id.

#### 1. Allegation of Facts Making Out Violation of a Constitutional Right

First, plaintiff has alleged facts that, if believed, could support a jury finding that a reasonable officer on the scene could have believed that plaintiff did not pose an imminent deadly threat.

#### 2. Right Clearly Established

Second, in determining whether such right was clearly established at the time of the incident, there is no requirement of case law finding that the precise conduct at issue is unlawful;

instead, the unlawfulness of the conduct must be manifest under existing authority. Wilson, 141 F.3d at 114. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, –– – U.S. ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (quotations and alteration omitted). Clearly, using deadly force to stop a suspect who is armed, but does not pose an imminent threat of severe bodily harm or death to an officer or others, is objectively unreasonable in an excessive force context. Jones v. Buchanan, 325 F.3d at 527; Bailey v. Kennedy, 349 F.3d 731, 743 (4th Cir. 2003).

### C. Objective Reasonableness

Finally, the court must consider whether a reasonable officer could have believed that his actions were objectively reasonable in light of all the circumstances. Among the many factors that a court must take into account when assessing the reasonableness of a law enforcement officer's decision to employ deadly force is "whether the suspect pose[d] an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. "[I]f the suspect threatens the officer with a weapon ... deadly force may be used ... if, where feasible, some warning has been given." Tennessee, 471 U.S. at 11–12. Even where, as here, a warning has been given, use of deadly force against an individual who "poses no immediate threat to the officer and no threat to others" is not reasonable. Garner, 471 U.S. at 11.

Viewing the evidence in a light most favorable to plaintiff, Scott v. Harris, 550 U.S. 372 (2007), a reasonable fact finder could conclude that a reasonable officer would not have believed his actions were objectively reasonable in light of a totality of the circumstances as such a fact finder could determine that the minor plaintiff did not pose an immediate threat to an officer or others. Indeed, in an unpublished opinion, the Court of Appeals for the Fourth Circuit held that

"police do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon." Pena v. Porter, 316 Fed.Appx. 303 (4th Cir. 2009). Absent plaintiff charging at the officer or coming within a distance that made the possession of the knife an *immediate* threat to the officer or others, a reasonable fact finder could well determine that no reasonable officer could have believed that plaintiff posed an immediate threat to the officer at "the moment that the force [was] employed." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.2011) (en banc ). In this case, plaintiffs have presented evidence that the minor plaintiff, some 32 feet away when shots were fired and who had arguably stopped his advance, was not an immediate threat to the safety of Officer Wilson or anyone else.

Defendants have pointed to Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), in arguing that qualified immunity should be granted. In Sigman, the Court of Appeals for the Fourth Circuit held, as follows:

> in determining objective reasonableness, the court must consider what a "reasonable officer on the scene" would have done, taking into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S.Ct. 1865. This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair.

Id. at 787. This court, had it been faced with the facts presented in Sigman would have also granted qualified immunity. In this case, the minor plaintiff was more than twice the distance, was not threatening to kill the officer, and had arguably stopped his advance. The Sigman court went on to hold that

> Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable. Accordingly, we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to

16

> the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case.

Id. at 788. While Officer Wilson testified that the minor plaintiff was only 20 feet away at the time he fired, the measurements on the ground as determined by the CMPD indicate that the minor plaintiff was 32 feet from defendant when the shots were fired. At that distance, the officer was arguably not faced with the "split-second decision" the Chapel Hill officers faced in Sigman as the potential threat to the officer's safety and the safety of others was more than double the distance. Indeed, the expert evidence presented at trial indicated that *had* the minor plaintiff decided to run at the officer with the knife starting at 32 feet, the officer would have had multiple opportunities to stop such a charge, especially where as here the officer already had his weapon drawn, he had taken an A-frame position, and aimed his weapon at the minor plaintiff.

## IV.     Conclusion

The court has carefully considered the totality of the circumstances in this case. Based on plaintiffs' proffer of evidence at the first trial of this matter, which this court has re-read from start-to-finish, a reasonable fact finder could determine that the minor plaintiff was too far away to justify Officer Wilson's application of deadly force as he did not, at 32 feet, pose a threat to the safety of the officers or others and that a Fourth Amendment violation occurred in this case. Gray–Hopkins v. Prince George's County, Md., 309 F.3d at 231.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant Matthew Wilson's Motion for Judgment as a Matter of Law (#73) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' renewed Motion for Judgment as a Matter of Law (#75) is **DENIED** for the reasons stated at the conclusion of trial and for the reasons further stated at the motions hearing.

In light of defendants' indication that an immediate interlocutory appeal of this decision will be taken to the Court of Appeal for the Fourth Circuit as of right, the Clerk of Court is instructed to terminate the 13 pending pretrial motions as "denied without prejudice" as a matter of housekeeping.

Signed: August 12, 2013

Max O. Cogburn Jr.
United States District Judge